# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

DAMION WASHINGTON,         )
           Plaintiff,        )
                           )
        v.                 )       CAUSE NO.: 2:10-CV-367-PRC
                           )
MICHAEL J. ASTRUE,         )
Commissioner of the Social Security    )
Administration,               )
          Defendant.     )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Damion Washington on September 20, 2010, and Plaintiff's Memorandum in Support of his Motion to Reverse the Decision of the Commissioner of Social Security [DE 26], filed by Mr. Washington on March 17, 2011. Mr. Washington requests that the September 4, 2009 decision of the Administrative Law Judge denying him disability insurance benefits be reversed or, alternatively, remanded for further proceedings. For the following reasons, the Court denies the request.

## PROCEDURAL BACKGROUND

On August 7, 2006, Mr. Washington filed an application for a period of disability and disability insurance benefits as a disabled adult child, alleging disability beginning [ ], 1989. In order to be approved for benefits as a disabled adult child, Mr. Washington needed to show that his disability began before age 22. Mr. Washington's application was denied initially on December 21, 2006, and upon reconsideration on April 9, 2007.

At Mr. Washington's request, a hearing was held on June 25, 2009, before Administrative Law Judge ("ALJ") Armstrong, at which Mr. Washington, his attorney, and a vocational expert

("VE") appeared. On September 4, 2009, the ALJ issued a decision denying Mr. Washington's

application. The ALJ made the following findings:

1.   As a disabled adult child, the claimant qualifies for benefits as of [], 2007, and must establish that his disability began on or before his 22nd birthday, or [ ], 2010.

2.   The claimant has not engaged in substantial gainful activity since [], 2007, the alleged onset date (20 CFR 404.1571 et seq.).

3.   The claimant has the following severe impairment: borderline intellectual functioning (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) but is limited to simple and repetitive work.

6.   The claimant has no past relevant work (20 CFR 404.1565).

7.   The claimant was born on [], 1989 and was 18 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from [ ], 2007 through the date of this decision (20 CFR 404.1520(g)).

(R. 24-32).

Mr. Washington sought review of the ALJ's decision, but the Appeals Council denied this request, leaving the ALJ's decision the final decision of the Commissioner.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A.  Medical History

Mr. Washington had a learning disability as a child and received special education in school. On March 24, 1999, when he was 10 years old and in third grade, his WISC-III full-scale IQ was 72. Mr. Washington was retested in January 2002, when he was 13 years old; his full-scale IQ score was 70, and he was reading at the second-grade level.  In September 2006, when Mr. Washington was 17 years old, he underwent psychological testing at the request of the Social Security Administration and obtained a full-scale IQ score of 56.  Dr. Parks, the psychologist who performed the examination, indicated that Mr. Washington was cooperative during the examination, but "appeared to lack consistent motivation on the exam."  AR 276.  Dr. Parks recognized that Mr. Washington had obtained a full-scale score of 70 on an earlier test, and stated it was "unclear as to Damion's actual level of cognitive functioning given the lack of validity of the current WAISIII scores." *Id.*

The Social Security Administration requested another psychological exam, which was performed at Mid-America Psychological and Counseling Services on November 7, 2006.  The examiner recognized Mr. Washington's earlier scores of 56 and 70.  On this administration, Mr.

3

Washington's full-scale IQ score was 69.  The examiner opined that the variation in scores was attributable to Mr. Washington's "variable motivation."  AR 272.

On November 15, 2006, Dr. Kenneth Neville, a non-examining State agency psychologist, completed a psychiatric review technique form.  He opined that Mr. Washington had borderline intellectual functioning, which caused mild limitations in activities of daily living and maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace.  Dr. Neville indicated no episodes of decompensation.  Dr. Neville also completed a mental residual functional capacity assessment and opined that Mr. Washington was markedly limited in the ability to understand, remember, and carry out detailed instructions and was moderately limited in the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, the ability to respond appropriately to changes in the work setting, and the ability to set realistic goals or make plans independently of others.

On February 22, 2007, Dr. Robert Coyle, a psychologist, administered an Adaptive Behavior: Street Survival Skills Questionnaire.  Mr. Washington was not able to show understanding of the following concepts: right, between, most, half, same, and front.  Mr. Washington could not identify an exit sign, a deposit money sign, a no trespassing sign, and a flammable sign; he was very poor at identifying the names of basic hand tools and had practically no knowledge of their functions; he did not understand any concepts that involved laundry sorting, cleaning, or drying; he was very limited in his understanding of basic concepts involved in health and safety as it relates to working; he could use a phone for emergency calls, but could not read a phone directory; he could tell time to the hour on a dial clock, but not to the nearest half hour or five minutes; he had trouble with timed activities and could not read a calendar; he could identify coins and dollar bills, but could not make

4

equivalent amounts of money, make change for a dollar, or make change for several dollars; he could easily be cheated in a monetary transaction; and he could not measure liquid in cups or fractions of cups, could not read a thermometer, and could not use a ruler for measuring inches or fractions of an inch.

> Dr. Coyle stated:
>
> The previous intelligence tests that suggested Mild Mental Retardation appear to be correct . . . . These data suggest that because of his limited intelligence and limited adaptive behavior, he is going to need a great deal of guidance and support from vocational rehabilitation if he is going to succeed in working after high school graduation. He will need a job coach, close supervision and supported employment.

AR 223.

Following a consultative examination on December 13, 2006, Dr. Teofilo Bautista diagnosed Mr. Washington with learning disability, obesity, and hypertension. At the examination, Mr. Washington weighed 333 pounds. Mr. Washington reported to Dr. Bautista that he is able to walk one block with shortness of breath, stand for 35 minutes with fatigue, and climb ten steps with shortness of breath. Upon examination, Dr. Bautista found no deformity of the back, good range of motion of both the upper and lower extremities, no joint pain or swelling, good grip strength in both hands, and good muscle tone, strength, and reflexes in both the upper and lower extremities. He found that Mr. Washington could walk and run well without difficulty. An examination in June 2008 showed that Plaintiff was 5'6" tall and weighed 339 pounds. This equates to a body mass index ("BMI") of 54.7.

### B. Testimony of Plaintiff and Plaintiff's Mother

Mr. Washington testified that he had worked at Hardee's fast food restaurant doing maintenance, changing the garbage, and cleaning the bathroom. He worked at Hardee's two days

a week for seven hours per day. He got the job through vocational rehabilitation, and his brother or his aunt would take him to work. He lost the job because his brother's car was broken down and he missed two days of work. The people at Hardee's told Plaintiff's vocational counselor that while he did the work, it was difficult for him to keep up with their pace. He had the job at Hardee's for close to three months.

Mr. Washington testified that, after Hardee's, he got a job at McDonald's. His brother took him to the job at McDonald's also. Mr. Washington worked two days a week and was supposed to be there from 11 to 5, but most days they sent him home. Sometimes they sent him home when business was slow, and sometimes they would send him home or have him switch to a less demanding job like sweeping when it was busy. They also sent him home when it was busy. Mr. Washington testified that he got his job at McDonald's through a vocational rehabilitation program.

Mr. Washington testified that he weighed 270 pounds and had high blood pressure and diabetes. He testified that he would like to work but that it seemed like everything was not working out for him. He got a high school diploma with a waiver. He could read some parts of the newspaper, such as sports scores, but he got confused over some of the words.

Mr. Washington's mother testified that she had to wash his clothes for him because he could not sort the colors, she made his bed, and she cooked for him. She testified that he was still slow in getting around despite losing weight.

### C. Vocational Expert Testimony

The ALJ asked the vocational expert ("VE") to consider a hypothetical individual who had a special education high school diploma and was limited to performing simple, unskilled work with a specific vocational preparation of (SVP) of 1 or 2. The VE testified that such an individual could

perform work as a dishwasher and that 3,399 such positions existed in the State of Indiana in the light work category as well as 6,798 medium positions. In addition, the hypothetical individual could perform "very concrete," production-like, repetitive jobs as a hand bander, ampule sealer, and packer/packager/hand packer/hand packager, with 858 positions existing in Indiana.

### D. The ALJ's Decision

The ALJ found that Mr. Washington had not engaged in substantial gainful activity since [], 2007, the alleged onset date, and that he had the severe impairment of borderline intellectual functioning. The ALJ found that Mr. Washington had further medically determinable impairments of obesity and hypertension, but that they were not severe impairments because they did not significantly limit the ability to do basic work activities. He further found that Mr. Washington's impairments did not meet or equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, discussing Listing 12.05 for mental retardation. Specifically, Mr. Washington did not meet Listing 12.05C because, while he had a valid full-scale IQ score of 69, he did not have another significant work-related limitation of function required to meet the Listing. The ALJ found that Mr. Washington did not meet Listing 12.05D because he did not have marked limitations in activities of daily living, social functioning, or concentration, persistence, or pace.

The ALJ found that Mr. Washington had the residual functional capacity to perform light work but was limited to simple, repetitive work. The ALJ also found that Mr. Washington's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment. Finally, the ALJ found that Mr. Washington was capable of performing the jobs of dishwasher and hand packager and, thus, was not disabled under the Social Security Act.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the

important evidence.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).  The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Mr. Washington makes several arguments for reversal or remand of the ALJ's decision. The Court considers each in turn.

## A. Listing 12.05

Mr. Washington first argues that the record supports a finding of disability under Listing 12.05C.  He reasons that the ALJ did not properly evaluate his impairments under the Listing and should have found that his borderline intellectual functioning, in combination with his obesity and hypertension, meet the requirements of the Listing.

At Step Two of the sequential analysis, the ALJ found that Mr. Washington's borderline intellectual functioning is a "severe" impairment.  In contrast, recognizing Dr. Bautista's diagnoses, the ALJ found that neither Mr. Washington's hypertension nor his obesity was a "severe" impairment for purposes of Step Two because Mr. Washington did not "allege functional limitations resulting from either condition."  AR 24.  Continuing on to Step Three, the ALJ considered the requirements of Listing 12.05C, which provides:

> Mental retardation:  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . ;
>
> C.      A valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (emphasis added); *see also Mendez v. Barnhart*, 439 F.3d 360, 361 (7th Cir. 2006) (explaining the impact of this range of IQ scores on an individual's ability to do work and the reasoning for requiring the combination of the low IQ score and an additional and significant physical or mental limitation).

The ALJ recognized that Mr. Washington's severe impairment of borderline intellectual functioning, which was based in part on Mr. Washington's valid, full scale IQ score of 69, satisfied the first requirement of Listing 12.05C that Mr. Washington have a valid verbal, performance, or full scale IQ of 60 through 70. However, the ALJ then found that Mr. Washington did not have the requisite additional "physical or other mental impairment imposing an additional and significant work-related limitation of function" to meet the Listing.

Mr. Washington argues that his extreme obesity and hypertension constitute the additional physical limitation that, paired with his IQ of 69, qualifies him under Listing 12.05C such that the Court should reverse the ALJ's decision and award benefits. Mr. Washington bears the burden of demonstrating that his impairments meet or equal a listed impairment. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Mr. Washington argues that at all times he has been in the morbidly obese category with a body mass index ranging from 43.6 to 54.7 and, quoting Social Security Ruling 02-1p, that "individuals with obesity may have problems with the ability to sustain function over time." Pl. Br., p. 9 (quoting SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002)). However, the Ruling provides that no specific level of weight, BMI, or descriptive terms for obesity (such as "extreme" or "morbid") establishes whether obesity is 'severe' and that the impact of a claimant's obesity on functioning is an "individualized assessment." SSR 02-1p.

The only information identified by Mr. Washington to conduct an individualized assessment of the limitations resulting from his obesity and hypertension is (1) that he listed obesity and hypertension on his "Disability Report - Appeal - Form SSA-3441," dated May 17, 2007, as "any new illnesses, injuries, or conditions since you last completed a disability report," AR 104; (2) his

mother's testimony that he has difficulty walking and gets tired after three minutes; and (3) Mr. Washington's explanation to Dr. Bautista, a consultative examining doctor, that he could walk one block with shortness of breath, could stand for 35 minutes with fatigue, and climb ten steps with shortness of breath. Mr. Washington's simple listing of obesity and hypertension on a form does not indicate any level of impairment. Although both his statements to Dr. Bautista and his mother's testimony suggests that his obesity imposes *some* functional limitations, Mr. Washington does not explain how his obesity and/or hypertension imposes an "additional and *significant* work-related limitation of function" such that reversal or remand would be warranted. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (finding the ALJ's failure to explicitly discuss the claimant's obesity to be harmless error when "no medical opinion in the record identified [the claimant's] obesity as significantly aggravating her back injury or contributing to her physical impairments" and the claimant failed to point to any other such evidence).

In contrast, in making his Step Two, Step Three, and RFC determinations regarding Mr. Washington's obesity, the ALJ properly relied on the report of Dr. Bautista, who conducted the only physical examination of record, to find that Mr. Washington did not have any significant physical limitations. *See* AR 29 ("Based on Dr. Bautista's findings, the undersigned concludes that the claimant does not have significant physical limitations."). In his decision, the ALJ recited the specific physical findings made by Dr. Bautista, including that Mr. Washington had good range of motion and full strength in both upper and lower extremities, was able to walk and run without difficulty, had good reflexes and sensation in both upper and lower extremities, had good grip strength in both hands, and was able to button, zip, and pick up coins. The ALJ also recited Dr. Bautista's observation that Mr. Washington was diagnosed with hypertension and was treated with

Lisinopril. On appeal, Mr. Washington does not contest Dr. Bautista's findings, the weight given to Dr. Bautista's opinion by the ALJ, or the ALJ's reliance thereon.

Social Security Ruling 02-1p provides that, at Step Three, "when evaluating impairments under mental disorder listings 12.05C, 112.05D, or 112.05F, obesity that is 'severe,' as explained in question 6, satisfies the criteria in listing 12.05C for a physical impairment imposing an additional and significant work-related limitation of function and in listings 112.05D and 112.05F for a physical impairment imposing an additional and significant limitation of function." SSR 02-1p.[1] The ALJ found that Mr. Washington's obesity was not severe at Step Two, and Mr. Washington does not challenge that finding. Therefore, the ALJ's decisions at Steps Two and Three as to the severity of Mr. Washington's obesity and hypertension are consistent.

When substantial evidence supports an ALJ's Step Three determination, the Court will not disrupt it. *See Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (stating that the court will affirm the ALJ's decision if it is supported by substantial evidence, which is "such relevant evidence

[1] Question 6 of Social Security Ruling 02-1p provides:
6. When Is Obesity a "Severe" Impairment?
As with any other medical condition, we will find that obesity is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities. (For children applying for disability under title XVI, we will find that obesity is a "severe" impairment when it causes more than minimal functional limitations.) We will also consider the effects of any symptoms (such as pain or fatigue) that could limit functioning. (See SSR 85-28, "Titles II and XVI: Medical Impairments That Are Not Severe" and SSR 96-3p, "Titles II and XVI: Considering Allegations of Pain and Other Symptoms In Determining Whether a Medically Determinable Impairment Is Severe.") Therefore, we will find that an impairment(s) is "not severe" only if it is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities (or, for a child applying under title XVI, if it causes no more than minimal functional limitations).
There is no specific level of weight or BMI that equates with a "severe" or a "not severe" impairment. Neither do descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes. Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.
SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002).

as a reasonable mind might accept as adequate to support a conclusion").  Therefore, the Court

denies the request to reverse or remand the ALJ's decision that Mr. Washington does not satisfy the

requirements of Listing 12.05C at Step Three.  *Compare Mendez*, 439 F.3d at 363 (remanding for

further proceedings when the ALJ failed to explain why the claimant's other impairments in addition

to a qualifying IQ score did not constitute an impairment imposing an additional and significant

work-related impairment); *Peterson v. Astrue*, No. 09 C 50084, 2010 WL 5423751, at *5-6 (Dec.

22, 2010) (remanding to the social security administration because of the inconsistencies at Steps

Two and Three when the ALJ found that the claimant's obesity was severe at Step Two yet found

at Step Three that the obesity did not cause any significant limitation of function).

Mr. Washington also argues that remand of the ALJ's Step Three determination is mandated

because the ALJ's finding that Mr. Washington does not meet the requirements of Listing 12.05C

is inconsistent with the ALJ's RFC determination limiting Mr. Washington to work at the light

exertional level.  Mr. Washington is correct that the ALJ assigned him an RFC limiting him to light

work without any explanation as to what impairment(s) warrant the limitation.  Social security ruling

96-8p provides that "[t]he RFC assessment considers [] functional limitations and restrictions that

result from an individual's *medically determinable impairment* or combination of impairments,

including the impact of related symptoms."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

Because the ALJ recognized Mr. Washington's obesity and hypertension as "medically

determinable impairments" at Step Two, both could be considered in formulating Mr. Washington's

RFC.  It is not inconsistent for an ALJ to first find a claimant's impairment, such as obesity, to be

not "severe" at Step Two nor to impose "an additional and significant work-related impairment" at

Step Three but then, in formulating the RFC, to find that the same "medically determinable

impairment" imposes some exertional limitations on the claimant's ability to work for purposes of Steps Four and Five. *See Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." ) (citing S.S.R. 96–8p; *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)).

"[P]rinciples of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ." *Steele v. Astrue*, 290 F.3d 936, 941 (7th Cir. 2002). The ALJ should have explained his basis for limiting Mr. Washington to light work. The Commissioner acknowledges that it is unclear why the ALJ limited Mr. Washington to light work but argues that the proper resolution, in light of the ALJ's express and repeated statements that Mr. Washington had no severe physical impairments, is to conclude that the ALJ erred in imposing any exertional limitations. The Commissioner further reasons that any such error should be deemed harmless because an erroneous imposition of unnecessary limitations does not affect the ultimate determination that Mr. Washington was not disabled.

The Court may find that an error is harmless if "[i]t is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). In such a case, remand is a waste of time. *Id.* The ALJ carefully considered all parts of the record, addressing the opinion of each doctor. The ALJ adequately articulated a basis, supported by the record, for finding that Mr. Washington's obesity and hypertension were not severe at Step Two and did not constitute "an additional and significant work-related impairment" at Step Three. Although it is unclear why the ALJ limited Mr.

Washington to light work, the limitation in the RFC is not inconsistent with his Step Two and Step Three findings. Therefore, remand or reversal on this alternate basis at Step Three is unwarranted. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading")."

## B. Credibility Finding

Mr. Washington argues that the ALJ made an impermissibly cursory credibility finding. The Commissioner responds that the ALJ's finding is supported by substantial evidence.

The Social Security Regulations provide that, in making a disability determination, the ALJ will consider a claimant's statement about his symptoms, including pain, and how they affect the claimant's daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id*. The Regulations establish a two-part test for determining whether complaints of pain or other symptoms contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. 20 C.F.R. § 404.1529(a).

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;

(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186, at *1 (Jul. 2, 1996). Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p, at *6; *see also* 20 C.F.R. § 404.1529(c)(2). An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong." *Prochaska*, 454 F.3d at 738. The ALJ's credibility determination, overall, must construct a "logical bridge" from the evidence to the conclusion. *See Myles v. Astrue*, 582 F.3d 672, 674 (7th Cir. 2009); *Villano*, 556 F.3d at 562 (7th Cir. 2009).

Mr. Washington argues that the ALJ's finding that his statements "are not credible to the extent that they are inconsistent with the above residual capacity assessment," AR 27, is an impermissibly conclusory post-hoc statement. *See Brown v. Astrue*, No. 09-CV-249, 2010 WL 1727864, at *2 (S.D. Ill. Apr. 27, 2010); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003). Mr. Washington argues that the ALJ impermissibly relied on boilerplate language instead of thorough analysis, coming to a conclusion regarding Mr. Washington's RFC and then formulating a credibility finding based on the RFC. The Court disagrees.

The heading of section 5 constitutes the ALJ's formal RFC finding: "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) but is limited to simple and repetitive work." AR 27. In the first three paragraphs following the heading, the ALJ sets forth the legal factors to be considered in making his determination. He then identifies Mr. Washington's allegations in the record regarding his limitations. First, the ALJ notes that Mr. Washington alleges that his borderline intellectual functioning imposes significant limitations on his ability to perform work activities. The ALJ then discusses Mr. Washington's allegations regarding the impact of his neonatal meningitis, that he does not do any household chores, that he does not drive or take public transportation, and that "he has difficulty keeping up with the pace of work at the fast food restaurant where he was employed on the date of the hearing, and that he is sometimes sent home when the restaurant is busy." AR 27.

The ALJ concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not reliable to the extent they are inconsistent with the above residual functional capacity assessment." AR 27. Despite the use of this "boilerplate language," the ALJ continued with the phrase "[i]n formulating this assessment," and then supported his credibility finding by analyzing Mr. Washington's statements and the evidence of record over three, single-spaced, full pages, evaluating the medical evidence of record in relation to Mr. Washington's allegations.

The ALJ gave significant weight to the opinions of consultative psychologists who opined as to Mr. Washington's motivation. Notably, Mr. Washington does not contest the weight the ALJ gave to any of the doctors' opinions. First, the ALJ gave Dr. Parks' opinions substantial weight and

noted Dr. Parks' finding that Mr. Washington did not appear to have consistent motivation. He then discussed the November 2006 psychological evaluator's conclusion that the variation between the IQ scores obtained in September and November "was due to variable motivation." The ALJ then gave substantial weight to Dr. Bautista's observations and opinions regarding Mr. Washington's physical limitations. The ALJ continued by according Dr. Neville's opinions substantial weight following his evaluation of Mr. Washington in November 2008. After discussing the findings, the ALJ noted that Dr. Neville opined that "the claimant's limitation in activities of daily living was attributable to maturity and motivation rather than disability." AR 29.

The ALJ discussed Dr. Coyle's February 2007 review of the record and his subsequent administration of the Street Survival Skills Questionnaire, which revealed that Mr. Washington in fact has limitations in adaptive functioning. The ALJ recognized Dr. Coyle's opinion that Mr. Washington would need a great deal of guidance and support from vocational rehabilitation if he was to succeed in working after high school including a job coach, close supervision, and supported employment and that Mr. Washington was receiving that guidance. AR 29-30.

The ALJ then discussed the vocational reports of Mr. Washington's employment at Hardee's and McDonald's. The ALJ noted that Mr. Washington lost his job in 2008 with Hardee's, not because of a disability, but because he missed work when his brother's car broke down. The ALJ noted the positive comments from his vocational supervisors but also the comment that Mr. Washington "needed to work on his pace, a point confirmed by the claimant." The ALJ included Mr. Washington's testimony that he was occasionally sent home during busy times because he was not able to keep sufficient pace but also noted that his supervisor at McDonald's reported that Mr. Washington's quality of work, attendance, and punctuality significantly exceeded requirements and

that his job knowledge and quantity of work exceeded requirements.  The ALJ then explained that the vocational reports support the RFC because they demonstrate that Mr. Washington has the functional capacity to do simple, repetitive work to his employer's satisfaction at McDonald's, that he has good social skills, and that he can learn and adequately perform basic work activities.  The ALJ recognized that Mr. Washington has a moderate limitation regarding pace but that he has shown he can become more proficient at work activities over time.

The ALJ concluded: "The evidence shows that he has overcome his limitations in adaptive functioning to a sufficient degree to perform simple work activities at McDonald's to the satisfaction of his supervisors, earning high marks for his job knowledge, quantity and quality of work, punctuality, and attendance.  With adequate vocational support, the claimant has shown that he is capable of simple, repetitive light work."  AR 30.  Mr. Washington argues that the ALJ did not explain how this finding was supported in light of Mr. Washington's testimony that he would be sent home when it got busy, a statement showing that his McDonald's employment was considered "supported," and that he never worked more than five hours in a day or 22 hours in a pay period. He also argues that the statement that he had difficulty keeping up and would be sent home when it was busy is consistent with his own testimony.  The Court finds that the ALJ sufficiently explained that he found Mr. Washington's allegations concerning the intensity, persistence, and limiting effects of his symptoms less credible in light of the opinions of the physicians and the vocational reports regarding his motivation, his ability to improve his pace overtime, and his performance at his job at McDonald's.  Thus, the ALJ has built a logical bridge between the evidence and his credibility finding, and Mr. Washington has not shown that the credibility finding is patently wrong.

## C. Favorable Vocational Evidence

In Part C of his opening brief, Mr. Washington argues that the ALJ failed to discuss vocational evidence suggesting that he was incapable of performing competitive work. First, Mr. Washington identifies the psychological evaluation performed by Dr. Coyle on February 22, 2007, at the request of the Vocational Department of the Indiana Division of Disability, Aging and Rehab Services, the results of which indicated moderate mental disability. Dr. Coyle explained that Mr. Washington's adaptive behavior score of 41 was much lower than his IQ score of 70. Dr. Coyle indicated that Mr. Washington was incapable of performing many simple tasks and concluded that his "problems seem to be much more involved than would be suggested by a diagnosis of academic learning disability . . . . These data suggest that because of his limited intelligence and limited adaptive behavior, he is going to need a great deal of guidance and support from vocational rehabilitation if he is going to succeed in working after high school graduation. He will need a job coach, close supervision, and supported employment." AR 223.

Mr. Washington argues that the ALJ did not properly account for this evidence because, although he cited portions of the report supporting employability, he did not discuss other portions of the record that support Mr. Washington's claims. This is inaccurate. On pages 29-30 of his decision, the ALJ itemized the specific adaptive limitations revealed by the Street Survival Skills Questionnaire administered by Dr. Coyle and recited Dr. Coyle's finding: "Based on these results, Dr. Coyle opined that the claimant would need a great deal of guidance and support from vocational rehabilitation if he was to succeed in working after high school, and would need a job coach, close supervision, and supported employment." AR 29-30. The ALJ then evaluated the evidence

demonstrating that Mr. Washington had received "just such support from Indiana vocational rehabilitation services over the last two years." AR 30.

Mr. Washington also argues that the ALJ relied on positive statements from Mr. Washington's vocational rehabilitation counselor, Connie Burchfield, and his job coach, Yvonne Nelson (Mr. Washington was working 20-25 hours per week, he enjoyed his job, and worked well with others, though he needed to work on his pace) but that the ALJ did not discuss the portions of Ms. Burchfield's report indicating that Mr. Washington was "Tier One," meaning that he qualified as "Most Severely Disabled" due to deficits in cognitive and learning skills, work skills, and work tolerance, which required multiple services over an extended period of time. AR 168. The "report" Mr. Washington references is a one-page form entitled "Indiana Vocational Rehabilitation Employment Services Results Based Funding Payment System Description." On the pre-printed form, Ms. Burchfield checked three (of nine possible) "life domain areas" (cognitive and learning skills, work skills, and work tolerance) that qualify Mr. Washington as "Tier One." At the bottom of the page, Ms. Burchfield wrote "Damion is Tier One" and "checked FL's apply." AR 169. She signed and dated the form July 13, 2009. There is no commentary or other information added to the form by Ms. Burchfield. Although the ALJ did not specifically reference this document in his decision, he nevertheless took into account the other similar evidence of record identifying the extent of Mr. Washington's vocational limitations, as set forth throughout this Order. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("Although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling."). The ALJ has provided a "logical bridge" between the evidence and his conclusions. *Id.*

at 475. This is not an instance in which the ALJ failed to credit the opinion of a non-medical source, as suggested by Mr. Washington.

### D. Residual Functional Capacity

Mr. Washington seeks remand on the basis that the ALJ did not fully account for his moderate limitations in concentration, persistence, or pace when formulating the RFC or in his hypothetical to the VE. In considering Listing 12.05B at Step Three of the analysis, the ALJ found that Mr. Washington has moderate limitations in concentration, persistence, or pace, recognizing that Mr. Washington has "significant difficulties staying focused on tasks at school and in psychological evaluations . . . . Vocational records indicate that the claimant needed to increase his pace at work." AR 26. As noted above, the ALJ also recognized in his RFC analysis Dr. Neville's finding that Mr. Washington had moderate difficulties in maintaining concentration, persistence, or pace. AR 29. However, in formulating the RFC, the ALJ limited Mr. Washington to "simple and repetitive work," AR 27, but did not include any limitations related to deficiencies in concentration, persistence, or pace.

Social Security Ruling 85-15 provides that, "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job . . . ." SSR 85-15, at p. 6. "Any impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment." *Id.*

Mr. Washington notes that he was categorized as "Most Severely Disabled" by his vocational rehabilitation counselor in part due to deficits in work tolerance and acknowledges that the ALJ

recognized that he had "significant difficulties staying focused" and needed to increase his pace at work. However, Mr. Washington argues that the ALJ did not explain how a limitation to simple, unskilled work accounts for the limitations in concentration, persistence, or pace because "[t]he ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620 (citing *Stewart*, 561 F.3d at 684-85; *Craft*, 539 F.3d at 677; *Kasarsky*, 335 F.3d at 544; SSR 85-15).

As set forth in Section B above, the ALJ discussed Mr. Washington's alleged limitations regarding the intensity, persistence, and limiting effects of his symptoms and found him not entirely credible, relying on the medical evidence of record to find that Mr. Washington's limitations in this area were the result of motivation rather than his disability. The ALJ explicitly discussed the weight of this evidence in formulating his RFC. Thus, the ALJ did not err in excluding a specific limitation for concentration, persistence, or pace in the RFC. *Compare Sullivan v. Astrue*, – F. Supp. 2d –, –, 2011 WL 5301785, at * 8 (N.D. Ill. Nov. 3, 2011) (finding in the RFC analysis that the claimant had the ability to carry out simple tasks at a consistent pace despite a reduced ability to handle stress and pressure in the workplace), *with White v. Astrue*, – F. Supp. 2d –, –, 2011 WL 5039802, at *9-10 (N.D. Ill. Oct. 24, 2011) (remanding because the ALJ did not adequately explain how she accounted for limitations in concentration, persistence, and pace by limiting the claimant only to simple and repetitive tasks). In contrast, the ALJ's analysis did find that Mr. Washington's allegations as well as the medical evidence support a limitation to simple and repetitive work, which the ALJ included in the RFC as well as the hypotheticals to the VE.

Mr. Washington also argues that the ALJ's hypothetical to the VE did not fully account for his limitation in concentration, persistence, and pace, citing *O'Connor-Spinner v. Astrue*, 627 F.3d

614 (7th Cir. 2010). The court in *O'Connor-Spinner* held that, "[i]n most cases . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *O'Connor-Spinner*, 627 F.3d at 620 (citing *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Kasarsky*, 335 F.3d at 544). In certain limited circumstances, the failure to use the specific terminology of "concentration, persistence and pace" in a hypothetical to an ALJ may be overlooked if the VE's familiarity with the claimant's limitations, despite any gaps in the hypothetical, is sufficiently based on an independent review of the medical record or having heard direct testimony addressing those limitations. *Id*. at 619. A hypothetical omitting the terminology may also be sufficient if it is "manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id*.

In this case, the ALJ initially posed a hypothetical to the VE of an individual with a special ed diploma from high school, no past relevant work (any past work was assisted), limited to simple, unskilled SVP: 1 or 2 jobs. The VE identified the jobs of dish washer with 3,399 jobs in the light category and 6,798 in the medium category, which is at SVP 1. The VE also identified the jobs in the category of a helper's production worker, also at SVP 1. The ALJ then asked, "Now let's say a same individual, he has additional difficulties in that he would be unable to stay – he could not do competitive work. Well, let's say he couldn't do any work which required like production quota type work where you had a line for production." AR 375. The VE testified that the helper's production workers would be affected because "they're more, obviously, quantifiable." *Id*. The VE testified there would be less of an effect on the dishwasher position "but still there would be some

production issues on task issues." *Id.* As a follow up question, the ALJ described the same individual but added that he could not stay on task, would not be able to maintain any kind of productivity, and would be too slow because of his abilities such that he could not do competitive employment. The VE responded that all employment would be eliminated. Finally, the ALJ asked whether the number of jobs would be impacted if the individual is off task for an average of 15 minutes per hour. The VE testified that the individual may be employable as a dishwasher in a setting with a selective job placement, like Mr. Washington was in at McDonald's. The Court finds that, in light of the ALJ's credibility determination regarding Mr. Washington's concentration, persistence, and pace and in light of the RFC, the ALJ posed proper hypotheticals to the VE incorporating Mr. Washington's limitations.

### E. Vocational Evidence

Mr. Washington contends that the ALJ made several errors related to the VE's testimony. The Court addresses each in turn.

*1. SVP and GED Levels*

First, Mr. Washington argues that the ALJ failed to discuss testimony from the VE that was favorable to his claim, and identifies testimony by the VE regarding the "reasoning level" and "SVP" level of certain jobs in relation to the VE's testimony that, based on Dr. Coyle's report, "it's questionable whether he demonstrates reasoning level of two." R. 381.

"SVP" is the acronym for "Specific Vocational Preparation," which refers to the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dep't of

Labor, Dictionary of Occupational Titles, App'x C(II), 1991 WL 688702 (G.P.O.) (4th ed, rev'd

1991).[2]  Unskilled work is defined as

> work which needs little or no judgment to do simple duties that can be learned on the
> job in a short period of time. The job may or may not require considerable strength.
> For example, we consider jobs unskilled if the primary work duties are handling,
> feeding and offbearing (that is, placing or removing materials from machines which
> are automatic or operated by others), or machine tending, and a person can usually
> learn to do the job in 30 days, and little specific vocational preparation and judgment
> are needed. A person does not gain work skills by doing unskilled jobs.

20 C.F.R. §§ 404.1568(a), 416.968.  Unskilled work corresponds with an SVP of 1 and 2.  *See* SSR

00-4p, 2000 WL 1898704, * 3 (Dec. 4, 2000).  The ALJ found that Mr. Washington could perform

"simple and repetitive" work.

The DOT also assigns each job a General Educational Development ("GED") score, which

"embraces those aspects of education (formal and informal) which are required of the worker for

satisfactory job performance."   Dep't of Labor, Dictionary of Occupational Titles, App'x C(III).

The GED scale is composed of three divisions–reasoning development, mathematical development,

and language development.  *Id*.  Reasoning Development Level 1 provides: "Apply commonsense

understanding to carry out simple one- or two-step instructions.  Deal with standardized situations

with occasional or no variables in or from these situations encountered on the job."  *Id*.  Reasoning

Development Level 2 provides: "Apply commonsense understanding to carry out detailed but

uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in

or from standardized situations."  *Id*.  In *Terry v. Astrue*, the Seventh Circuit Court of Appeals found

that the record supported the plaintiff's ability to perform jobs with a GED reasoning score of three,

recognizing another case in which a court found that a job requiring level three reasoning is not

---

[2] The Dictionary of Occupational Titles can also be found at http://www.occupationalinfo.org.

inconsistent with a claimant's ability to follow only simple, concrete instructions. 580 F.3d at 478 (citing *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007)). Other district courts in this circuit that have analyzed the relationship between simple, unskilled work and level 2 reasoning have found the two not to be inconsistent. *Thompkins v. Astrue*, No. 09 C 1339, 2010 WL 5071193, *10-11 (N.D. Ill. Dec. 6, 2010) (citing and discussing *Simms v. Astrue*, 599 F. Supp. 2d 988, 1007-08 (N.D. Ind. 2009); *Masek v. Astrue*, No. 08 C 1277, 2010 WL 1050293, at * 22 (N.D. Ill. Mar. 22, 2010); *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005); *Money v. Barnhart*, 91 Fed. App'x 210, 214 (3d Cir. 2004); *Flaherty v. Halter*, 182 F. Supp. 2d 824, 850-51 (D. Minn. 2001)); *see also Mattison v. Astrue*, 2010 WL 446051, at * 3 (E.D. Wis. Feb. 2, 2010) (recognizing the holding in *Terry* and positing that,"under *Terry*, it may be that a limitation to 'simple, routine' work is not inconsistent with reasoning level two."); *but see Sawyer v. Astrue*, No. 10 C 8019, 2011 WL 60101954, at *20 (N.D. Ill. Dec. 6, 2011) (distinguishing the holding in *Terry* regarding reasoning level 3 positions not being inconsistent with a limitation to simple, unskilled work ).

In his decision, the ALJ concluded that Mr. Washington was capable of performing the jobs of dishwasher (3,399 jobs) and hand packager (858 jobs) based on the VE testimony that these jobs exist in the economy based on the hypothetical profiles posed by the ALJ. As for SVP, the VE testified that the dishwasher job has an SVP level of 1, *see* AR 374, and the hand packager job has an SVP level of 2. These SVP levels do not appear inconsistent with the ALJ's limitation to unskilled work. Mr. Washington has not argued otherwise.

As for the GED scores, the VE initially testified that the dishwasher job, which he testified falls within the DOT position of "silver wrapper," has a GED for reasoning development of 1 (which the VE lists as "learning"): "GED on those would be 211, which would translate into a reading 2,

math 1, learning 1." *See* AR 374. However, the DOT listing for Silver Wrapper assigns GED levels of 2 for reasoning, 1 for math, and 1 for reading. *See* Dep't of Labor, Dictionary of Occupational Titles, No. 318.687-018, 1991 WL 672757 (4th ed, rev'd 1991). As noted above, after reviewing Dr. Coyle's report, the VE commented that "it's questionable whether [Mr. Washington] demonstrates reasoning level of two," referring to the GED score for "reasoning development." AR 381. He also testified that exclusion of reasoning level two positions would impact the number of jobs available. Counsel for Mr. Washington asked the VE how many of the number of jobs of both dishwasher and "helper's production" (which the ALJ did not find to be a job available to Mr. Washington) would be left, and he could not give an exact figure. Counsel then asked the VE to identify jobs with a reasoning level of 1, and the VE identified the job of hand packager, testifying that the position is sedentary and unskilled with an SVP of 2 and identifying 858 positions in the regional economy. The VE described these jobs as "concrete, repetitive" and "very cognizable" because of the "reasoning level one definition." AR 385-86. The VE then gave further testimony that some of these hand packager jobs may not be available if they are semi-skilled, which had been excluded by the ALJ's hypothetical, but did *not* testify that the number of hand packager jobs would decrease because of a reasoning level of 1.

Mr. Washington does not argue that he cannot perform jobs with a reasoning level of 2; rather, he argues simply that the ALJ failed to discuss the VE's comment that Dr. Coyle's report made him question whether Mr. Washington would be able to perform jobs with a reasoning level of 2. Given the extensive questioning of the VE by both the ALJ and Mr. Washington's counsel on the issue of reasoning level, the issue and any potential conflict between the VE's testimony and the DOT positions were apparent through the hearing testimony. The RFC determination is the

responsibility of the ALJ, *see* 20 C.F.R. § 404.1546(c), and the ALJ found Mr. Washington limited

to simple and repetitive work.  Case law supports a finding that a limitation to simple and repetitive

work is not inconsistent with a GED reasoning level of 2.  Although the VE commented that Dr.

Coyle's report brings into question whether Mr. Washington can perform a job with a reasoning

level of 2, Mr. Washington has not provided any additional argument or pointed to other evidence

of record that he cannot in fact perform a position with a reasoning level of 2.  The Court has upheld

the ALJ's RFC determination as supported by substantial evidence.

In the absence of other evidence or argument by Mr. Washington that he is unable to perform

work at a reasoning level of 2, the Court finds that the ALJ did not err by not specifically addressing

the VE's comment regarding Dr. Coyle's report nor did the ALJ err by relying on the VE's

testimony regarding the number of available dishwasher and hand packager jobs available at Step

5 of the analysis.

## 2. *Social Security Ruling 00-4p*

"Under SSR 00-4p, . . . the ALJ has an affirmative responsibility to ask if the VE's testimony

conflicts with the DOT, and if there is an apparent conflict, the ALJ must obtain a reasonable

explanation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).  Specifically, SSR 00-4p requires:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT.  In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and if the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000).  "SSR 00-4p places an affirmative duty on the

ALJ to resolve conflicts between the evidence the VE has provided and the Dictionary of

Occupational Titles after the VE has testified. The ALJ cannot transfer his duty to the VE." *Kallio v. Astrue*, No. 2:07-CV-406, 2009 WL 500552, at *9 (N.D. Ind. Feb. 27, 2009) (citations omitted).

In this case, the ALJ asked the VE, prior to the questioning the VE, "Mr. Fisher, you are going to testify in accordance with the information contained in the Dictionary of Occupational Titles, Selected Characteristics of Occupations, and if there is a difference between your information . . . you're going to let us know, correct?" AR 373-74. Mr. Washington argues that the ALJ erred by posing the question prior to the VE's testimony. Recognizing that compliance with SSR 00-4p is subject to a harmless error analysis, Mr. Washington argues that the ALJ's error is not harmless because the VE never gave a DOT number for the dishwasher job and there could be a potential conflict between the VE's testimony and the applicable DOT section. *See Terry*, 580 F.3d 471 (recognizing that the failure to ask about the conflict is harmless unless there actually was a conflict) (citing *Renfrow*, 496 F.3d at 921). Mr. Washington is incorrect. As discussed above, the VE specifically testified that the job title of the dishwasher job was "silver wrapper," a title that appears in the DOT. *See* DOT, No. 318.687-018, 1991 WL 672757. Although the VE offered testimony that the silver wrapper position had a reading level of 2, which Mr. Washington argues for the first time in his reply brief exceeds his abilities, the DOT listing sets the reading level for silver wrapper at 1. The DOT definition of silver wrapper is otherwise consistent with the remainder of the VE's testimony.

*3. Hypotheticals*

Finally, Mr. Washington argues that the ALJ did not include all of Mr. Washington's limitations in the hypothetical questions to the VE when the ALJ limited Mr. Washington to work at the light exertional level in the RFC but did not include the limitation to light work in any of the

hypotheticals to the VE.  Mr. Washington argues that this is problematic because the VE did not

provide a DOT number for the dishwasher position and the job of "Kitchen Helper" is performed

at the medium exertional level, according to the DOT.  As discussed in the previous section, the VE

*did* testify that the dishwasher position falls under the DOT listing of "silver wrapper," which is

listed at the light exertional level.  Thus, there is no conflict.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the relief requested in Plaintiff's

Memorandum in Support of his Motion to Reverse the Decision of the Commissioner of Social

Security [DE 26].

SO ORDERED this 12th day of January, 2012.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record